**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 1:26-cr-85-CJN** |
| **v.** | |
| **DUSTIN WETZEL,**<br>**also known as "Dusto,"**<br>**also known as "Austin,"** | |
| **Defendant.** | |

**GOVERNMENT'S MEMORANDUM
<u>IN SUPPORT OF PRETRIAL DETENTION</u>**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its motion that the defendant, Dustin Wetzel, be detained pending trial pursuant to 18 U.S.C. §§ 3142(f)(2)(A) (serious risk of flight) and 3142(f) (safety of the community).

Wetzel and his co-conspirators have been engaged in a longstanding, ongoing scheme to steal and sell vehicles using sophisticated means. The defendants steal vehicles using electronic devices, store the stolen vehicles in stash houses, disguise the vehicles' identities, and then sell the vehicles and covertly ship them interstate and overseas. When agents attempted to arrest Wetzel this week pursuant to an arrest warrant, Wetzel jumped from a second-story window, fled the scene, and eluded law enforcement for approximately two hours. Agents ultimately found Wetzel and arrested him at an automotive shop more than one mile away from law enforcement's initial contact with him. Similarly, in February 2025, when law enforcement in Pennsylvania attempted to stop Wetzel in a stolen vehicle, Wetzel fled on foot and made good his escape.

Wetzel is a serious flight risk and a danger to the community. In short, he possesses the

1

means and skills to steal and disguise vehicles, he communicates with and exchanges funds with criminal contacts across the United States and abroad, he misused a credit privacy number to obtain an apartment, which he used in furtherance of the scheme in this case, he maintains a transient living situation and has no legitimate ties to this community, and he has, on multiple occasions, fled from and successfully eluded law enforcement. Wetzel's actions and history demonstrate that he continues to present a serious risk of flight if released, and considering the factors specified under 18 U.S.C. § 3142(g), there is no condition or combination of conditions that will reasonably assure his appearance in court and the safety of the community. Accordingly, the Court should detain Wetzel pending trial.

## BACKGROUND

Starting as early as February 2025, until his arrest on April 21, 2026, Wetzel, and his co-conspirators, stole vehicles in the District of Columbia, Maryland, Pennsylvania, and elsewhere. The conspirators typically executed the vehicle thefts overnight while the vehicles were parked and turned off and the vehicle's owners were not present. To carry out the thefts, Wetzel and his co-conspirators broke into vehicles using tools such as screwdrivers, disabled the vehicles' alarm system, Bluetooth, and GPS capabilities, and then used electronic devices to re-pair the vehicles with previously blank key fobs.

Wetzel and others stored the stolen vehicles in storage locations including a parking garage located at 70 I Street Southeast (the "70 I Street Garage") where they would alter, remove, or disguise the identity of the stolen vehicles, then arrange for the stolen vehicles to be sold to purchasers in the United States and abroad. Throughout the scheme, Wetzel received money from, and corresponded extensively with, a vehicle purchaser based in Ghana, Africa.

Turning to specific thefts involved in this case, between January 30 and January 31, 2025,

a victim reported a Chevrolet Corvette stolen in the District of Columbia.  Wetzel was captured in

video footage driving the stolen vehicle inside the 70 I Street Garage on February 22, 2025.



***Wetzel inside 70 I Street Garage with a Stolen Vehicle***

Between February 1 and February 2, 2025, four victims reported four Honda CRVs stolen

in the District of Columbia.  On February 5, 2025, Wetzel exchanged the following messages with

Jacob Hernandez, an indicted co-conspirator, regarding transporting stolen vehicles:

> Hernandez:    Transport is 1 hr 30 min away
>
> Wetzel:        Pulling up rn

Wetzel then photographed the vehicles loaded onto a car transporter in Maryland and

exchanged additional messages with Hernandez regarding receiving payment in bitcoin.



***Photograph From Wetzel's Cell Phone Showing Stolen Vehicles on a Car Transporter***

Between February 6 and February 7, 2025, two victims reported two Honda CRVs stolen

in the District of Columbia.  Text messages exchanged between Hernandez and Wetzel revealed

that Hernandez sent Wetzel map locations for the stolen vehicles before the thefts.  Wetzel, Hernandez, and others then coordinated to sell the vehicles to purchasers in Pennsylvania for $3,900.  Before making the sale, Wetzel and a co-conspirator took videos of the vehicles.



***Still Image From Video Showing Wetzel Inside a Stolen Vehicle***

On February 25, 2025, Hernandez sent Wetzel the following messages: "Man let's go strike," Finish the contract," "We came to Philly Cause the containers are here," and "Need 12 units."  On February 26, 2025, when law enforcement in Pennsylvania attempted to stop Wetzel in a stolen vehicle, Wetzel fled on foot and escaped.  Video footage revealed multiple co-conspirators were also inside the stolen vehicle before police attempted the stop.  Police searched the stolen vehicle and recovered an electronic device that can be used to reprogram vehicles.



***Electronic Device Recovered from Stolen Vehicle Occupied by Wetzel and Other Co-conspirators***

On April 13, 2025, a victim reported a Honda Civic stolen in Maryland.  That same night, video footage captured Wetzel driving the vehicle inside the 70 I Street Garage and removing the vehicle's license plate.



***Wetzel Inside Stolen Vehicle in the 70 I Street Garage***



***Wetzel Removing License Plate from Stolen Vehicle in the 70 I Street Garage***

Wetzel then exchanged the following messages with Chance Clark, a charged co-conspirator:

Wetzel:        jus got a type r

CLARK:        That's it Yall selling or

Wetzel:        Yeah that's it tried 2 type rs only got one

Throughout the scheme, Wetzel maintained close contact with a facilitator and purchaser based in Africa. On May 10, 2025, Wetzel coordinated with the facilitator in Africa to ship stolen vehicles from Maryland to Georgia to be shipped abroad. Messages recovered from Wetzel's cell phone revealed that Wetzel placed a tracking device inside a stolen vehicle and shared the device's location with the contact in Africa so they could both track the vehicle's progress. As the vehicles passed through North Carolina, Wetzel messaged "There [sic] almost to Atlanta" and sent a screenshot of the tracking device's location.



***Screen Shot from Wetzel's Cell Phone***

Law enforcement recovered the stolen vehicles from a shipping container set to be shipped to Ghana, Africa. To avoid detection, the contents of the container were mislabeled as furniture, appliances, household goods, and groceries.

6

On May 22, 2025, Wetzel was captured in CCTV footage with another co-conspirator stealing a vehicle using an electronic device.  The pair arrived at the scene of the theft in a different stolen vehicle.



***Wetzel Using an Electronic Device to Steal a Car***

Back inside the 70 I Street Garage, Wetzel removed a car seat and other possessions from the stolen car.  Wetzel and others then loaded that vehicle and others onto a car transporter in Maryland.



***Photograph From Wetzel's Cell Phone Showing Stolen Vehicles on a Car Transporter***

On June 2, 2025, a victim reported an Acura TLX stolen in the District of Columbia.  That same morning, Young arrived at the 70 I Street Garage inside the vehicle.  Approximately three weeks later, Wetzel and Young agreed to sell the vehicle to Wetzel's contact in Africa.  The two exchanged the following messages:

> Wetzel:       Lmme get type s
>
> Young:        I'll break bread with you

> Wetzel:        My African finna pay 3k
>
> Young:        Itee

Wetzel followed through on the deal and sent his contact in Africa a video showing that vehicle and several other stolen vehicles on a car transporter in Maryland.

On June 11, 2025, Wetzel and others coordinated to steal three vehicles and send them to a contact in Ghana, Africa. After sending the vehicles, Wetzel requested $5,140 in payment. He also told his contact that he needed to get a new apartment because "our cpn is going bad." Law enforcement later learned that Wetzel obtained an apartment above the 70 I Street Garage using a Credit Privacy Number or "CPN."[1] Wetzel was evicted from that apartment on October 9, 2025. He has not obtained a new residence and has been staying at a significant other's residence, where he fled when law enforcement arrived to arrest him.

### WETZEL'S CRIMINAL HISTORY

Wetzel has two prior convictions and a pending case. On August 28, 2024, he pleaded nolo contendere to Eluding/Disregarding Police and was sentenced to one year of supervised probation. He was on probation in that case throughout the course of the conspiracy and during the commission of several of the charged overt acts. According to his probation officer in that case, Wetzel reported he buys cars at auctions and resells them. He estimated he sells about 6-7 cars per month. Wetzel was unable to demonstrate his employment to the probation officer. He did note, however, that he wanted to "open a shop" to expand his vehicle sales. In addition, on March 17, 2026, Wetzel pleaded guilty in Montgomery County, Pennsylvania to Conspiracy to Commit Unauthorized Use of Motor Vehicles. That conviction stemmed from the same conduct

---

[1] A CPN is a nine-digit number that is formatted like a Social Security number and can be used fraudulently as a fake Social Security number.

described above involving vehicle thefts carried out by Wetzel and other co-conspirators in Pennsylvania in February 2025.  In that case, he was sentenced to one year of probation.  Wetzel also has a pending vehicle theft case in Prince George's County, Maryland filed on September 6, 2025.  That case arose from an August 27, 2025 incident in which Wetzel was stopped by police while driving a stolen vehicle that had previously been observed inside the 70 I Street Garage.

## PROCEDURAL HISTORY

On April 16, 2026, a grand jury returned an indictment charging Wetzel and his co-conspirators with violations of 18 U.S.C. § 371 (Conspiracy to Possess, Sell, and Transport Stolen Motor Vehicles), 18 U.S.C. § 2313 (Possession/Receipt/Storage of Stolen Motor Vehicles), 18 U.S.C. § 2312 (Interstate Transportation of Stolen Motor Vehicles), and 22 D.C. Code § 3211, 3212(a) (First Degree Theft).  Wetzel was arrested on April 21, 2026.  An initial appearance was held on April 22, 2026.

## ARGUMENT

Under the Bail Reform Act, this Court may detain a defendant upon motion of the government in a case that, as here, involves "a serious risk that such person will flee."  18 U.S.C. § 3142(f)(2)(A).  After a court determines by a preponderance of the evidence that the defendant presents a serious risk of flight, the court then considers whether any condition or combination of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial.  *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988); *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986).  If the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and

the safety of any other person and the community," the Court shall order a defendant held pending trial.  18 U.S.C. § 3142(e).

While the Bail Reform Act requires that detention be supported by "clear and convincing evidence" when the justification is the safety of the community, it is silent as to the level of proof required to establish risk of flight.  *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). This circuit, however, has ruled that such a finding need only be supported by a "preponderance of the evidence." *United States v. Vortis*, 785 F.2d 327, 329 (D.C. Cir. 1986).

Courts commonly agree that detention based on risk of flight "is a valid regulatory device" because it "serves the principles of [our constitutional] system by guaranteeing that the defendant will stand trial and, if convicted, face punishment." *United States v. Melendez-Carrion*, 790 F.2d 984, 1002 (2d Cir. 1986) (citing *Bell v. Wolfish*, 441 U.S. 520, 534, (1979)).

To justify detention on the basis of dangerousness to the community, the government must prove by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021).

As a preliminary matter, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f).  Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer.  *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use."  *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986).  *See also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992).  A pretrial detention hearing should not be used as a discovery device and cross-examination

should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery. *See Smith*, 79 F.3d at 1210; *Williams*, 798 F. Supp. at 36.

In determining whether an individual is a flight risk or a danger to the community, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g); *see also United States v. Vasquez-Benitez*, 919 F.3d 546, 551 (D.C. Cir. 2019). As set forth more fully below, these factors weigh in favor of detaining the defendant.

## I.       The Nature and Circumstances of this Offense Merits Detention.

The grand jury found probable cause to believe that Wetzel committed Conspiracy to Possess, Sell, and Transport Stolen Motor Vehicles, several counts of Possession of Stolen Motor Vehicles and Interstate Transportation of Stolen Motor Vehicles, and First Degree Theft. Those charges encompass more than twenty stolen vehicles identified in the Indictment, which are valued at more than $700,000. Moreover, through his participation in an extensive auto-theft ring, Wetzel has demonstrated a wide-ranging skillset related to covertly stealing cars using electronic devices, disguising and concealing stolen cars, coordinating with co-conspirators around the United States and abroad, and obtaining funds from foreigners to finance his operations.

For example, as described above, in a single transaction in February 2025, Wetzel and his co-conspirators profited over $3,000 from selling vehicles stolen in the District of Columbia to purchasers in Pennsylvania. And in a single transaction in June 2025, Wetzel received over $5,000 from selling stolen vehicles to a purchaser in Ghana. In order to carry out these sales, Wetzel and his co-conspirators maintained relationships abroad and successfully coordinated complex, covert

11

movements of stolen vehicles across state lines and internationally.

In addition, the conduct in this case was ongoing and recurrent. Wetzel and his co-conspirators planned their thefts in advance, deliberately targeted high-value cars, and carried out the thefts and transports using sophisticated means to avoid detection. Moreover, the scheme required Wetzel and his co-conspirators to communicate with foreign nationals, manage complex movements of vehicles, conceal their identity or the identity of stolen vehicles and exchange funds with each other, purchasers, and financiers.

## II.    The Weight of the Evidence Against the Defendant is Strong.

Here, overwhelming evidence corroborates the allegations in the Indictment. For example, Wetzel's cell phone contains a trove of messages, photographs, and video related to the auto-theft ring. In addition, Wetzel and his co-conspirators were repeatedly captured in high-quality CCTV footage transporting and manipulating vehicles inside the 70 I Street Garage. The timing of those videos corresponds to the messages sent between Wetzel and the co-conspirators as the ring plotted, carried out the thefts, stored and manipulated the vehicles, and then facilitated the transport of the vehicles interstate and internationally. On multiple occasions, the vehicles that Wetzel possessed and manipulated were later recovered at international shipping ports. And in every instance charged in the Indictment, the vehicles were stolen using an electronic device so that the thieves could obtain the vehicles without having to obtain the vehicle's original key fobs.

Here, the overwhelming weight of the evidence should be considered equally with the other § 3142 factors. In *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 U.S. Dist. LEXIS 18988, at *29–30. Instead, "the weight of the evidence against [a] defendant

[should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). Moreover, the Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight.

Indeed, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 U.S. Dist. LEXIS 18988, at \*29–30. So it is in this case, the weight and strength of the evidence increases the prospect that Wetzel will flee if released.

### III.   Wetzel's History and Characteristics also Favor Detention.

Wetzel's history and characteristics suggest Wetzel is a serious flight risk. He has a significant prior history of fleeing from law enforcement including as recently as this week, when he successfully evaded police for nearly two hours after jumping out a second-floor window. Moreover, unlike many defendants who come before this Court, Wetzel has no ties to the District of Columbia or the surrounding area. His family does not reside here, and he does not have a permanent address in the area. Wetzel apparently told Pretrial Services that he has lived in Woodford, Virginia for the past three years. Pretrial Services Report ("PSR"), at 1. In fact, the investigation in this case revealed that Wetzel was living at the 70 I Street Southeast apartment complex above the 70 I Street Garage for most of this conspiracy. He obtained that apartment

13

using a credit privacy number and was then evicted from that apartment in October 2025. He has since been staying in various locations including the residence where he was arrested but has not been living in Woodford, Virginia. Based on records in a law enforcement database and additional investigation, that address belonged to Wetzel's mother who passed away last year. After Wetzel was arrested, Wetzel's father, who lives in Maine, contacted police.

He was evicted from his apartment in the District of Columbia, and he obtained that apartment using a credit privacy number and then used the apartment to carry out this scheme. He has not obtained any new stable address and fled from the address where he was staying when law enforcement arrived to arrest him. He also has no lawful employment or other legitimate ties to the community. Wetzel apparently told Pretrial Services that he has $4,000 in monthly income by no employer. PSR, at 2. Further, Wetzel has an extensive history of vehicle thefts including a conviction in Pennsylvania, a pending case in Maryland, and the long-running conspiracy charged here. Throughout this scheme, Wetzel and his co-conspirators have frequently traveled across state lines, identified various storage locations, and adroitly avoided law enforcement by disguising vehicles and carrying out thefts with sophisticated electronic means. Wetzel's criminal history also demonstrates a sustained pattern of similar criminal conduct even while under court supervision. Accordingly, this factor weighs heavily in favor of continued detention. *See Munchel*, 991 F.3d at 1281 (concluding that courts can and should "consider whether it believes the defendant will actually abide by its conditions when making the release determination"); *see, e.g., United States v. Glasgow*, No. 1:20-cr-27-7 (KBJ), 2021 U.S. Dist. LEXIS 109972, at *37 (D.D.C. June 11, 2021) ("Because Glasgow has previously disobeyed a court-ordered condition of

14

pre-trial supervision, the Court has little faith that he would not do so again if released pending trial.").

## IV.   Wetzel Presents a Danger to the Community.

Wetzel presents an economic danger to the community, which also is a basis for detention. The legislative history of the Bail Reform Act makes clear that Congress intended that the "safety of any other person or the community" language in 18 U.S.C. § 3142 was expected to be given a broad construction.  *See* S. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3195 ("The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.") (emphasis added).  Courts have appropriately construed the statute to find that protection of the community from economic harm is a valid objective of bail conditions. *See, e.g., United States v. Madoff*, 586 F. Supp. 2d 240, 252 (S.D.N.Y. 2009) (noting support for considering economic harm in evaluating danger to the community under § 3142 or the Bail Reform Act); *United States v. Schenberger*, 498 F. Supp. 2d 738, 742 (D.N.J. 2007) (holding that "[a] danger to the community does not only include physical harm or violent behavior" and citing the Senate Committee Report language reproduced above); *United States v. LeClercq*, No. 07-80050-cr, 2007 WL 4365601, at *4 (S.D. Fla. Dec. 13, 2007) (finding that a large bond was necessary to, among other things, "protect the community from additional economic harm"); *United States v. Persaud*, No. 05 Cr. 368, 2007 WL 1074906, at *1 (N.D.N.Y. Apr. 5, 2007) (concurring with the Magistrate Judge that "economic harm qualifies as a danger within the

contemplation of the Bail Reform Act"); *United States v. Gentry*, 455 F. Supp. 2d 1018, 1032 (D. Ariz. 2006) (in a fraud and money laundering case, in determining whether pretrial detention was appropriate, the court held that danger to the community under Section 3142(g) "may be assessed in terms other than the use of force or violence . . . [including] economic danger to the community"); *United States v. Giordano*, 370 F. Supp. 2d 1256, 1270 (S.D. Fla. 2005) ("There can be no question that an economic danger . . . falls under the broad umbrella of 'dangerousness' as that term is used throughout the Bail Reform Act.").

The possibility of economic danger to the community if Wetzel is released is based on the defendant's proven ability to steal vehicles using sophisticated means and facilitate the rapid transport of those stolen vehicles across state lines and international boundaries.  This is especially true in this case where Wetzel has stolen scores of vehicles over a long period of time.  Indeed, the total value of the vehicles identified in the Indictment is over $700,000.  Moreover, while Wetzel and his co-conspirators steal cars while the victims are not present, these are not victimless crimes. Each theft deprived a victim of valued possessions and jeopardized a victim's sense of safety and security.  Accordingly, there is no condition or combination of conditions that would reasonably assure that Wetzel would return to court if he were released.

## CONCLUSION

The government respectfully requests that the Court issue an Order granting its motion that the defendant be held without bond pending trial.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:     */s/ Jacob M. Green*
        Jacob M. Green
        M.A. Bar No. 706143
        Assistant United States Attorney
        601 D Street NW
        Washington, D.C. 20530
        E-mail: Jacob.green3@usdoj.gov
        Telephone: 202-803-1617

17