**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**JAMES YOUNG,**<br>**also known as "D1,"**<br><br>    **Defendant.** | **Case No. 1:26-cr-85-CJN** |

**EMERGENCY MOTION TO STAY DEFENDANT'S RELEASE
AND *DE NOVO* REVIEW OF MAGISTRATE JUDGE'S RELEASE ORDER**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, seeks this Court's review of the release order issued by the Honorable Magistrate Judge Matthew J. Sharbaugh on April 28, 2026. The Government first requests that the Court stay Magistrate Judge Sharbaugh's order releasing the Defendant. The Government further requests that the Court grant *de novo* review of Judge Sharbaugh's denial of the Government's motion for pre-trial detention pursuant to 18 U.S.C. §§ 3142(f)(2)(A) (serious risk of flight) and 3142(f) (safety of the community). This Court has the authority to grant a stay to consider this emergency *de novo* review of the Magistrate Judge's order of release.

Young and his co-conspirators have been engaged in a longstanding, ongoing scheme to steal and sell vehicles using sophisticated means. The defendants steal vehicles using electronic devices, store the stolen vehicles in stash houses, disguise the vehicles' identities, and then sell the vehicles and covertly ship them interstate and overseas. On April 16, 2026, a grand jury returned an indictment charging Young and his co-conspirators with violations of 18 U.S.C. § 371 (Conspiracy to Possess, Sell, and Transport Stolen Motor Vehicles).

Young was arrested in Maryland, where he was already on home detention as of April 14,

2026, for charges of theft, unlawful taking of a motor vehicle, unauthorized removal of a motor vehicle, and rogue and vagabond in Upper Marlboro, Maryland—the very conduct alleged in the Indictment. In that case, Young fled from police before being apprehended. Young is also on supervised probation after pleading guilty to unauthorized removal of motor vehicles on May 17, 2025, and burglary and destruction of property on September 8, 2025. Young's actions and criminal history demonstrate that he presents a serious risk of nonappearance and a danger to the community if released.

## BACKGROUND

Starting as early as February 2025, until his arrest on April 21, 2026, Young, and his co-conspirators, stole vehicles in the District of Columbia, Maryland, Pennsylvania, and elsewhere. The conspirators typically executed the vehicle thefts overnight while the vehicles were parked and turned off and the vehicle's owners were not present. To carry out the thefts, Young and his co-conspirators broke into vehicles using tools such as screwdrivers, disabled the vehicles' alarm system, Bluetooth, and GPS capabilities, and then used electronic devices to re-pair the vehicles with previously blank key fobs.

Young and others stored the stolen vehicles in storage locations including a parking garage located at 70 I Street Southeast (the "70 I Street Garage") where they would alter, remove, or disguise the identity of the stolen vehicles, then arrange for the stolen vehicles to be sold to purchasers in the United States and abroad. Throughout the scheme, Young facilitated the sale of stolen vehicles to purchasers based in Africa. For most of 2025, several of the conspirators used an apartment above the 70 I Street Garage, which Dustin Wetzel, Young's co-conspirator, obtained

with a Credit Privacy Number or "CPN."[1]  On October 17, 2025, law enforcement searched the apartment and recovered a takeout bag with the name "DUSTo" (Wetzel's nickname), credit cards and documents linked to multiple auto-theft victims, key-fob parts, and a pill bottle labeled with Young's name.

Turning to specific thefts involved in this case, on May 8 and May 9, 2025, two victims reported a Honda CRV and a Honda Accord stolen in the District of Columbia.  On May 8, 2025, Wetzel arrived at the 70 I Street Garage in the CRV.  Wetzel then exchanged the following messages with Young regarding selling the CRV and another stolen vehicle to Young's contact in Africa:

YOUNG: You put the accord & crv on transport ? If not imma use them for my sale

WETZEL: No we going to

WETZEL: Don't put hem joints on bro

YOUNG: Itee

WETZEL: We gonna do transport prob b4 1

YOUNG: Itee

YOUNG: I bouta go get my African these joints rq lmk when ya hit ready

Young arrived at the 70 I Street Garage on May 9, 2025 in the stolen Accord.  The Accord was later seized by law enforcement at the Port of Baltimore bound for Ghana.  The shipment was

---

[1] A CPN is a nine-digit number that is formatted like a Social Security number and can be used fraudulently as a fake Social Security number.

incorrectly labeled as household goods and personal effects instead of motor vehicles.

**Young After Exiting Stolen Vehicle Inside 70 I Street Garage**

On June 2, 2025, a victim reported an Acura TLX stolen in the District of Columbia.   That same morning, Young arrived at the 70 I Street Garage inside the vehicle.  Approximately three weeks later, Wetzel and Young agreed to sell the vehicle to Wetzel's contact in Africa.  The two exchanged the following messages:

Wetzel:      Lmme get type s

Young:       I'll break bread with you

Wetzel:      My African finna pay 3k

Young:       Itee

On June 7, 2025, a victim reported a Honda CRV stolen in the District of Columbia. That same day, that vehicle arrived at the 70 I Street garage driven by Wetzel and another coconspirator, Khobe David.  Young then photographed the vehicle inside the 70 I Street Garage.



**Young Photographing Stolen Vehicle Inside 70 I Street Garage**

## YOUNG'S CRIMINAL HISTORY

Young committed all of the acts described above while on pretrial release. On March 17, 2025 he was charged with Burglary-4th Degree-Store in Maryland. He remained on pretrial release in that case and was ultimately convicted in September 2025 and sentenced to five years of probation. On May 13, 2025, he was charged in Maryland with Unauthorized Removal of a Motor Vehicle. He was convicted in that case in September 2025 and sentenced to three years of probation. While on probation in those cases, on April 8, 2026, officers attempted to stop Young and two others in a stolen vehicle in Washington, D.C. The vehicle fled to Maryland where it was disabled, and Young and the other two occupants then fled on foot but were ultimately apprehended.

## PROCEDURAL HISTORY

On April 16, 2026, a grand jury returned an indictment charging Young and his co-conspirators with violations of 18 U.S.C. § 371 (Conspiracy to Possess, Sell, and Transport Stolen Motor Vehicles). Young was arrested on April 21, 2026. An initial appearance was held on April 22, 2026. On April 28, 2026, following a detention hearing, Judge Sharbaugh ordered Young

released to home detention with, among other conditions, GPS monitoring, a third-party custodian, and restrictions on the use of electronic devices.

## ARGUMENT

**A. This Court Has the Authority to Grant the Motion to Stay Release Pending a *De Novo* Review**

The power to stay an order of release is directly related to a district court's authority to review a release order of a magistrate judge. *See, e.g.*, *United States v. Brigham*, 569 F.3d 220, 230 (5th Cir. 2009) ("given that the issue being reviewed involves a person's release from custody pending further legal proceedings, the absence of stay authority could render the district court's review power illusory.").  An alternative interpretation would risk allowing the charged defendant the opportunity to "harm[] the community or disappear[] by the time the district court's ruling is rendered and detention is ordered" if the district court determines to order the defendant detained. *Id.*; *see also United States v. Salazar-Andujo*, 599 F. Supp. 3d 491, 494 (W.D. Tex. 2022); *United States v. Rosales-Villegas*, No.: 2:23-cr-00044-GMN-VCF, 2023 U.S. Dist. LEXIS 59776, at *5-6, 7 n.1 (D. Nev. Apr. 4, 2023) ("The Court's decision is also based on unanimous caselaw. As the Government notes, "stays of release are so commonplace and uncontroversial that they are often relegated to a sentence or two in the procedural history of an opinion on the merits of the detention decision." (Resp. 3:9-24) (collecting cases). Here, the Court is guided by the practical considerations underlying the issuance of a stay as well as caselaw within the Ninth Circuit routinely authorizing stays.").

The government is aware of the Honorable Magistrate Judge Zia M. Faruqui's recent decision denying a motion to stay in *United States v. Abass*, 25-CR-00079 (TSC), ECF No. 12 (April 11, 2025).  Judge Faruqui indicated that although magistrate courts typically suspend an order of release pending the government's request for *de novo* review of the Magistrate Judge's

release order, that the Court would no longer do so under the four factors articulated in *Nken v. Holder*, 556 U.S. 418 (2009).  The government, however, is not seeking an extraordinary length of time in which to have the Court consider the merits of a stay which will require significant, detailed briefing, but rather, an emergency stay to present the merits of the requested detention to the district court judge.

Thus, the government seeks a brief administrative stay of the order of release, and as such, the request should not be analyzed under the *Nken* factors.  As this Circuit has noted, "[t]he purpose of [this] administrative stay is to give the court sufficient opportunity to consider the merits of the motion for a stay pending appeal."  *Cobell v. Norton*, No. 03-5262, 2004 WL 603456, at *1 (D.C. Cir. Mar. 24, 2004).  Such a stay, as the Supreme Court noted recently in *United States v. Texas*, 144 S. Ct. 797, 798 (2024), "buys the court time to deliberate" and does not "typically reflect the court's consideration of the merits." *Id.* at 798 (Barret, J., concurring). District courts have recognized that administrative stays are also applicable in seeking emergency relief, including in the District of Columbia. *See, e.g.*, *Dellinger v. Bessent*, 2025 WL 450488 (D.D.C. Feb. 10, 2025); *National Council of Nonprofits v. Office of Management & Budget*, 2025 WL 314433 (D.D.C. Jan. 28, 2025); *Order, Texas v. Department of Homeland Security*, No. 24-CV-306 (E.D. Tex. Aug. 26, 2024).  As these courts have recognized, the "[t]he authority for an administrative stay arises from the All Writs Act and a court's inherent authority to manage its docket." *Dellinger*, 2025 WL 450488 (quoting *Order, Texas,* No. 24-CV-306, at 2).

### B.  *De Novo* Review of the Magistrate's Release Order

Under the Bail Reform Act, this Court may detain a defendant upon motion of the government in a case that, as here, involves "a serious risk that such person will flee."  18 U.S.C. § 3142(f)(2)(A).  After a court determines by a preponderance of the evidence that the defendant

presents a serious risk of flight, the court then considers whether any condition or combination of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial. *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988); *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986). If the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C. § 3142(e).

While the Bail Reform Act requires that detention be supported by "clear and convincing evidence" when the justification is the safety of the community, it is silent as to the level of proof required to establish risk of flight. *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). This circuit, however, has ruled that such a finding need only be supported by a "preponderance of the evidence." *United States v. Vortis*, 785 F.2d 327, 329 (D.C. Cir. 1986).

Courts commonly agree that detention based on risk of flight "is a valid regulatory device" because it "serves the principles of [our constitutional] system by guaranteeing that the defendant will stand trial and, if convicted, face punishment." *United States v. Melendez-Carrion*, 790 F.2d 984, 1002 (2d Cir. 1986) (citing *Bell v. Wolfish*, 441 U.S. 520, 534, (1979)).

To justify detention on the basis of dangerousness to the community, the government must prove by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021).

Further, Title 18, U.S.C. § 3145(a) states:

  **(a) Review of a release order** – If a person is ordered released by a magistrate, …

> (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for

revocation of the order or amendment of the conditions of release
. . .

The motion shall be determined promptly.

On the government's motion to review a release order, this Court considers *de novo* the magistrate judge's denial of pre-trial detention. In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not previously raised.

In short, the Court may proceed as best enables it to resolve the question posed: whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . . .

*See* S. Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3195-3196.[2]

---

[2] To that end, it is worthwhile recalling Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

> Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. . . . The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to

In determining whether an individual is a flight risk or a danger to the community, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g); *see also United States v. Vasquez-Benitez*, 919 F.3d 546, 551 (D.C. Cir. 2019).   As set forth more fully below, these factors weigh in favor of detaining the defendant.

I.       **The Nature and Circumstances of this Offense Merits Detention.**

The grand jury found probable cause to believe that Young committed Conspiracy to Possess, Sell, and Transport Stolen Motor Vehicles.  That conspiracy encompasses more than twenty stolen vehicles identified in the Indictment, which are valued at more than $700,000. Moreover, through their participation in an extensive auto-theft ring, Young and his co-conspirators demonstrated a wide-ranging skillset related to covertly stealing cars using electronic devices, disguising and concealing stolen cars, coordinating with co-conspirators around the United States and abroad, and obtaining funds from foreigners to finance their operations.  For example, in a single transaction in June 2025, the conspirators received over $5,000 from selling stolen vehicles to a purchaser in Ghana.  In order to carry out these sales, Young and his co-conspirators communicated with foreign nationals, managed complex movements of stolen

---

those defendants who pose an especially grave risk to the safety of the community. . . . *This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.*

*See* S. Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3486-3487. (Emphasis added.)

vehicles, concealed their identities or the identity of stolen vehicles, and exchanged funds with each other, purchasers, and financiers.

## II.   The Weight of the Evidence Against the Defendant is Strong.

As in this case, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023), at *29–30.

Here, overwhelming evidence corroborates the allegations in the Indictment. For example, a cell phone recovered from Young's co-defendant Dustin Wetzel contains a trove of messages, photographs, and video related to the auto-theft ring including many messages exchanged with Young. In addition, Young and his co-conspirators were repeatedly captured in high-quality CCTV footage transporting and manipulating stolen vehicles inside the 70 I Street Garage. The timing of those videos corresponds to the messages sent between Young and the co-conspirators as the ring plotted, carried out the thefts, stored and manipulated the vehicles, and then facilitated the transport of the vehicles interstate and internationally. On multiple occasions, the vehicles that Young and his co-conspirators possessed and manipulated were later recovered at international shipping ports. And in every instance charged in the Indictment, the vehicles were stolen using an electronic device so that the thieves could obtain the vehicles without having to obtain the vehicle's original key fobs.

## III.   Young's History and Characteristics Favor Detention

Young has a history of committing crimes while on release. Specifically, he was on pretrial release from March 2025 through September 2025 in a burglary case and then from May 2025 to

September 2025 in an Unauthorized Removal of a Motor Vehicle case.  Yet while on release, he participated in vehicle thefts, coordinated with coconspirators to sell stolen vehicles, and maintained contact with purchasers of stolen vehicles based in Africa.  Then, while on probation in those cases, just two weeks ago, Young fled from police in a stolen car and then continued to flee on foot after the car was disabled.  Young's actions and criminal history demonstrate that he continues to present a serious risk of flight if released.

### IV.   Young Presents a Danger to the Community.

Young presents an economic danger to the community, which is also a basis for detention. The legislative history of the Bail Reform Act makes clear that Congress intended that the "safety of any other person or the community" language in 18 U.S.C. § 3142 was expected to be given a broad construction.  *See* S. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3195 ("The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.") (emphasis added).  Courts have appropriately construed the statute to find that protection of the community from economic harm is a valid objective of bail conditions. *See, e.g., United States v. Madoff*, 586 F. Supp. 2d 240, 252 (S.D.N.Y. 2009) (noting support for considering economic harm in evaluating danger to the community under § 3142 or the Bail Reform Act); *United States v. Schenberger*, 498 F. Supp. 2d 738, 742 (D.N.J. 2007) (holding that "[a] danger to the community does not only include physical harm or violent behavior" and citing the Senate Committee Report language reproduced above); *United States v. LeClercq*, No. 07-

80050-cr, 2007 WL 4365601, at *4 (S.D. Fla. Dec. 13, 2007) (finding that a large bond was necessary to, among other things, "protect the community from additional economic harm"); *United States v. Persaud*, No. 05 Cr. 368, 2007 WL 1074906, at *1 (N.D.N.Y. Apr. 5, 2007) (concurring with the Magistrate Judge that "economic harm qualifies as a danger within the contemplation of the Bail Reform Act"); *United States v. Gentry*, 455 F. Supp. 2d 1018, 1032 (D. Ariz. 2006) (in a fraud and money laundering case, in determining whether pretrial detention was appropriate, the court held that danger to the community under Section 3142(g) "may be assessed in terms other than the use of force or violence . . . [including] economic danger to the community"); *United States v. Giordano*, 370 F. Supp. 2d 1256, 1270 (S.D. Fla. 2005) ("There can be no question that an economic danger . . . falls under the broad umbrella of 'dangerousness' as that term is used throughout the Bail Reform Act.").

The possibility of economic danger to the community if Young is released is based on Young's proven ability to steal vehicles using sophisticated means and facilitate the rapid transport of those stolen vehicles across state lines and international boundaries.  This is especially true in this case where Young and his co-conspirators have stolen scores of vehicles over a long period of time.  Indeed, the total value of the vehicles identified in the Indictment is over $700,000. Moreover, while Young and his co-conspirators steal cars while the victims are not present, these crimes are not victimless.  Each theft deprived a victim of valued possessions and jeopardized a victim's sense of safety and security.

V.    **A Third-Party Custodian Cannot Ensure Young's Appearance and the Safety of the Community**

Judge Sharbaugh found that the Defendant's stepfather, Mr. Talley, could effectively supervise the Defendant and mitigate the danger he presents and the risk that he will not appear.

Mr. Talley lives with his wife and a juvenile daughter in Hyattsville, Maryland. Further, Judge Sharbaugh ordered that the Defendant not use personal electronic devices while on release and directed Mr. Talley and others living in the home to password-protect their electronic devices and not reveal the passwords to Young.

The challenge faced by third party custodians, who are essentially being asked to act like correctional officers twenty-four hours a day for someone they care for deeply, has repeatedly been recognized by courts in this jurisdiction. *See* Order (ECF No. 14), *United States v. Joyner*, 22-CR-252 (TNM) (D.D.C. Aug. 3, 2022) (reversing the magistrate court's order releasing the defendant to a third-party custodian); Order (ECF No. 55), *United States v. Handy*, 22-CR-164 (RBW) (same), *aff'd*, Case No. 22-3045, D.C. Cir. (2022); Order, ECF 54, *United States v. Charles Cunningham*, 23-CR-7 (JMC) (D.D.C. March 13, 2023) ("third-party custodian, no matter how competent or dedicated, cannot stand in the shoes of the defendant. Nor should a third-party custodian be cast in the role of jailer…. Mr. Cunningham's custodians cannot supervise his behavior on a 24/7 basis."); Order, ECF 18, *United States v. Trevor Wright*, 22-CR-410 (CRC) (D.D.C. Dec. 23, 2022) ("family members are not correctional officers. Nor should they be expected to play that role").

Here, Mr. Talley works full-time as a schoolteacher. His apartment is not equipped with video surveillance, and his apartment complex does not permit residents to install cameras. He therefore has no way to monitor Young during several hours every day. Moreover, Judge Sharbaugh's order related to other devices in the home is untenable. The order aims to address the salient risk that Young will continue to coordinate with his confederates while on pretrial release (as Young has done previously), but the order relies on the voluntary participation of Mr. Talley's wife and child, both of whom are beyond the reach of the Court. In addition, the release order

permits the Defendant to leave his home to seek employment and to work.  This provides Young with ample opportunity to obtain an electronic device, which he could use to facilitate his flight and to continue carrying on his criminal scheme.

In short, given Young's longstanding involvement in an ongoing criminal conspiracy, history of committing new crimes while on release, and wide-ranging connections to participants in an auto-theft ring located in various jurisdiction and abroad, Young should be detained pending trial.

**CONCLUSION**

For all the foregoing reasons, the Government respectfully requests that the Court detain the Defendant pending trial on these charges.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY


By:    */s/ Jacob M. Green*
Jacob M. Green
M.A. Bar No. 706143
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
E-mail: Jacob.green3@usdoj.gov
Telephone: 202-803-1617